FRANK R. AND JUDITH C. PAULSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GERALD J. VON ALMEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Paulson v. Commissioner
Docket Nos. 21436-85, 21438-85.
United States Tax Court
T.C. Memo 1995-387; 1995 Tax Ct. Memo LEXIS 381; 70 T.C.M. (CCH) 399; August 14, 1995, Filed *381 Decisions will be entered under Rule 155. Lois C. Blaesing and Chauncey W. Tuttle, Jr., for petitioners. Mary P. Hamilton, Paul Colleran, and William T. Hayes, for respondent. DAWSON, Judge. WOLFE, Special Trial Judge DAWSON; WOLFE
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] They were tried and briefed separately but consolidated for purposes of opinion. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling *382 cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transaction in these cases are substantially identical to those in the Provizer case. Through a second tier partnership, Efron Investors (EI), petitioners Frank R. Paulson and Gerald J. Von Almen invested in the Clearwater Group limited partnership (Clearwater), the same partnership considered in the Provizer case. Pursuant to petitioners' requests at trial, this Court took judicial notice of our opinion in the Provizer case. In a notice of deficiency issued by certified mail on April 12, 1985, respondent determined deficiencies in the joint 1978 and 1981 Federal income taxes of petitioners Frank R. and Judith C. Paulson (the Paulsons) in the amounts of $ 1,666 and $ 9,854, respectively. In notices of deficiency issued by certified mail on April 12, 1985, respondent determined deficiencies in Gerald J. Von Almen's 1978, 1979, and 1981 Federal income taxes in the respective amounts of $ 6,425, $ 5,948, and $ 10,800. [2] In the notices of deficiency, respondent also determined *383 that the deficiencies in the Paulsons' 1978 and 1981 Federal income taxes and Gerald J. Von Almen's 1978, 1979, and 1981 Federal income taxes were substantial underpayments attributable to tax-motivated transactions and that, as a result, interest on those deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). [3] The deficiencies for taxable years 1978 and 1979 result from disallowance of investment tax and business energy credit carrybacks from 1981. *384 In addition to the deficiencies and additions to tax described above, in amended answers, respondent asserted the following additions to petitioners' Federal income taxes: Additions to Tax Under
Docket No.
Petitioners
Year
Sec. 6653(a)
Sec. 6653
Sec. 6653
Sec. 6659
(a)(1)
(a)(2)
21436-85
Paulson
1978
$ 83
--
--
$ 500
1981
--
$ 493
[1]
2,393
21438-85
Von Almen
1978
321
--
--
1,928
1979
297
--
--
1,784 1981
--
540
[1]
2,079 The issues in these consolidated cases are: (1) Whether the assessments are barred by the statute of limitations; (2) whether expert reports and testimony offered by respondent are admissible into evidence; (3) whether petitioners are entitled to claimed deductions and tax credits with respect to Clearwater as passed through EI; (4) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a) for the years in issue; (5) whether petitioners are liable for the additions to tax under section 6659 for underpayment of *385 taxes attributable to valuation overstatement; and (6) whether petitioners are liable for increased interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference. Petitioners resided in Munster, Indiana, when their petitions were filed. During the years in issue Frank R. Paulson (Paulson) was a boilermaker, Judith C. Paulson was a teacher, and Gerald J. Von Almen (Von Almen) was a construction superintendent. Paulson and Von Almen are limited partners in EI, which is a limited partner in the Clearwater limited partnership. The Clearwater limited partnership is the same recycling partnership that we considered in Provizer v. Commissioner, supra. The underlying deficiencies in these cases resulted from respondent's disallowance of claimed losses and tax credits that were passed through both Clearwater and EI to Paulson and Von Almen. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra. *386 [4] Those facts may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for $ 5,886,000 ($ 981,000 each). ECI Corp., in turn, resold the recyclers to F & G Corp. for $ 6,976,000 ($ 1,162,666 each). F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were accomplished simultaneously. We refer to these transactions collectively as the Clearwater transaction. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $ 50,000. *387 PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap. In 1981, EI acquired a 43.313-percent limited partnership interest in Clearwater, Paulson acquired a 1.596-percent limited partnership interest in EI, and Von Almen acquired a 3.194- percent limited partnership interest in EI. As a result of passthrough from Clearwater and EI, Paulson deducted an operating loss in the amount of $ 4,470 and claimed investment tax and business energy credits totaling $ 9,644 and Von Almen deducted an operating loss in the amount of $ 8,945 and claimed investment tax and business energy credits totaling $ 19,302. [5] Paulson used $ 7,978 of the credits claimed with respect to his investment in EI and Clearwater on his 1981 Federal income tax return and carried back $ 1,666, the unused portion of the claimed business energy credit, to 1978. Von Almen used $ 6,929 of his claimed credits on his 1981 return and carried back the unused portion of the credits to 1978 *388 and 1979 in the respective amounts of $ 6,425 and $ 5,948. Respondent disallowed petitioners' claimed deductions and credits related to EI's investment in Clearwater. EI is an Indiana limited partnership that was formed in May of 1981 by Morton L. Efron (Efron) as the general partner and Real Estate Financial Corp. (REFC) as the initial limited partner. Fred Gordon (Gordon) is the president of REFC, which is owned by members of Gordon's family. EI was formed to acquire limited partnership interests in an office building in Buffalo, New York (the office building), and a shopping center in Haslett, Michigan (the shopping center). In contemplation of these ventures, EI prepared a private placement memorandum (the original *389 offering memorandum) and distributed it to potential limited partners. At some time in late 1981, EI abandoned the contemplated investment in the shopping center and substituted limited partnership interests in Clearwater and a K-Mart shopping center in Swansea, Massachusetts (the K-Mart investment). The revised investment objectives were presented in a revised offering memorandum (the revised offering memorandum). The revised offering memorandum indicated that EI intended to invest in 100 percent of the limited partnership interests in the office building (10 units), 43.75 percent of the limited partnership interests in Clearwater (7 units), and 15.625 percent of the limited partnership interests in the K-Mart investment (2-1/2 units). Potential EI limited partners were informed of the change in EI's investment objectives through informal conversations and the revised offering memorandum. MFA Corp. (MFA) is the ministerial agent for EI. Efron owns 50 percent of the stock of MFA, and REFC owns the remaining 50 percent. The revised offering memorandum states that Efron, as general partner of EI, and MFA, as the ministerial agent for EI, will receive substantial fees, compensation, *390 and profits from EI. The contemplated payments to MFA include: (1) $ 100,000 for supervisory management of the office building and ministerial fees; (2) $ 100,000 - $ 125,000 as loan commitment fees; (3) $ 25,000 for note collection guarantees; and (4) a maximum of $ 100,750 in investment advisory fees. In addition, MFA was also the ministerial agent for the office building limited partnership and, according to the revised offering memorandum, received substantial payments in that capacity. Paulson learned of EI and the Clearwater transaction from Efron. In 1981, Paulson was an acquaintance of Efron; at trial Paulson described Efron as a friend. Paulson met Efron through his brother, Wayne Paulson, who had prior investment experience with Efron. Von Almen learned of EI and the Clearwater transaction from Efron and Wayne Paulson. In 1981 Von Almen, Efron, and Wayne Paulson were acquaintances; at trial, Von Almen described them as "just mutual friends". In addition, Efron was Von Almen's attorney with respect to Von Almen's divorce proceedings. Wayne Paulson acted as Von Almen's offeree representative with respect to Von Almen's investment in EI. However, Wayne Paulson did not review *391 the original offering memorandum with Von Almen, he did not aid Von Almen in completing the offeree questionnaire, and he never discussed recycling with Von Almen. Efron was the general partner of EI. In addition, Efron owned limited partnership interests in EI through Efron and Efron Real Estate, a partnership owned by Efron and his wife, and AMBI Real Estate, a partnership owned by Efron and his sister. EI was the first partnership for which Efron served as a general partner. Efron organized EI so that he could earn legal fees and fees for managing the partnership. He received compensation and fees as the general partner of EI and as a 50-percent shareholder of MFA. Efron learned of the Clearwater transaction from Gordon. In 1981 Gordon was counsel to EI, to Efron as the general partner of EI, to Efron personally, and to MFA. He and Efron have known each other since meeting at the University of Michigan in 1955. In the early 1960's Efron and Gordon began investing together in the stock market, real estate, business loans, and other investments. Gordon is an attorney who holds a master's degree in business administration and at one time was employed by the Internal Revenue Service. *392 Prior to the date of the Clearwater private placement offering, Gordon had experience involving the evaluation of tax shelters. Gordon was paid a fee in the amount of 10 percent of some investments he guided to Clearwater; however, he did not receive a fee directly from Clearwater for the EI investments. Efron was aware that Gordon received commissions from the sale of some units in recycling ventures. [6] Gordon recommended investing in the Clearwater offering to the investors in EI, as well as to some of Gordon's other clients. *393 Efron obtained financing for the EI investments through local banks. Some of the limited partners in EI made a cash downpayment to EI and then signed installment promissory notes for the remainder of the purchase price. Thereafter, Efron pledged any promissory notes received from limited partners as security for loans to EI. In addition to lending funds directly to EI, the banks also offered loans to individual limited partners for the downpayments needed with respect to the EI investments. Paulson subscribed to purchase one-fourth of a limited partnership unit ($ 25,000) in EI, and Von Almen subscribed to purchase one-half of a limited partnership unit ($ 50,000). Efron guided both Paulson and Von Almen to Donald Cassaday (Cassaday), a vice president of the First Bank of Whiting, to finance acquisition of their interests in EI. Cassaday was involved with arranging the financing for EI with Efron and arranged required financing for some of the EI limited partners. Both Paulson and Von Almen borrowed all of the funds they required to finance acquisition of their interests in EI from the First Bank of Whiting through Cassaday. The notes were secured solely by the EI investments. *394 Both Paulson and Von Almen graduated from high school and completed 1 year of college. Judith C. Paulson holds a degree in education from Indiana University. Petitioners do not have any formal training or work experience relating to investments. Petitioners do not have any education or work experience in plastics recycling or plastics materials. They did not independently investigate the Sentinel recyclers or see a Sentinel recycler or any other type of plastics recycler prior to participating in the recycling ventures. OPINION In Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 926 F.2d 1216 (6th Cir. 1993), a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $ 50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) *395 held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers. Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that their investments in the Sentinel EPE recyclers were similar to the investment described in Provizer v. Commissioner, supra, and, pursuant to their request, we have taken judicial notice of our opinion in the Provizer case. Petitioners invested in EI, a tier partnership that invested in Clearwater. The underlying transaction in these cases (the Clearwater transaction), and the Sentinel EPE recyclers considered in these cases, are the same transaction and machines considered in Provizer v. Commissioner, supra.
Issue 1. Statute of Limitations In their petitions, petitioners allege that the notices of deficiency were not issued within the statutory limitations period. *396 This issue appears to have been abandoned. None of the trial memoranda or briefs address the statute of limitations. Regardless of whether the issue was abandoned, the record shows that the notices of deficiency in these cases were issued within the statutory limitations period. In general, section 6501(a) requires assessment of tax to be made within 3 years after a return is filed, whether the return was filed on or after the date prescribed. Section 6501(b)(1) provides that if a return is filed before the due date, for purposes of section 6501, the return shall be considered filed on the due date. Section 6501(j) provides that deficiencies resulting from credit carrybacks may be assessed within the period applicable to the year that produced the carrybacks. The records in these cases do not show the dates that the Paulsons or Von Almen filed their 1981 Federal income tax returns; however, both the Paulsons' and Von Almen's 1981 returns were due on April 15, 1982. See sec. 6072. The earliest date that the returns are deemed filed for purposes of section 6501 is April 15, 1982. See sec. 6501(b)(1). Respondent mailed the notices of deficiency in these cases on April 12, 1985, within *397 the 3-year period provided by section 6501(a). Because the deficiencies determined by respondent for 1978 in docket No. 21436-85 and for 1978 and 1979 in docket No. 21438- 85 relate solely to investment tax and business energy credit carrybacks from 1981, the period of limitations under section 6501(a) is governed by the period of limitations applicable to 1981. Sec. 6501(j). As noted above, the statutory period for assessment for 1981 had not expired when respondent issued the notice of deficiency in these cases. Therefore, the statutory period under section 6501(j) with respect to the carrybacks to 1978 and 1979 had not expired when respondent issued her notices of deficiency. Issue 2. Admissibility of Expert Reports and Testimony
Before addressing the substantive issues in these cases, we resolve an evidentiary issue. At trial, respondent offered in evidence the expert opinions and testimony of Steven Grossman (Grossman) and Richard Lindstrom (Lindstrom). At trial and in their reply briefs, petitioners object to the admissibility of the testimony and reports. The expert reports and testimony of Grossman and Lindstrom are identical to the testimony and reports in Fine v. Commissioner, T.C. Memo. 1995-222. *398 In addition, petitioners' arguments with respect to the admissibility of the expert testimony and reports are identical to the arguments made in the Fine case. For discussions of the reports and testimony, see Fine v. Commissioner, supra, and Provizer v. Commissioner, supra. For a discussion of the testimony and petitioners' arguments concerning the admissibility of the testimony and reports, see the Fine case. For reasons set forth in Fine v. Commissioner, supra, we hold that the reports and testimony of Grossman and Lindstrom are relevant and admissible and that Grossman and Lindstrom are experts in the fields of plastics, engineering, and technical information. We do not, however, accept Grossman or Lindstrom as experts with respect to the ability of the average person, who has not had extensive education in science and engineering, to conduct technical research, and we have limited our consideration of their reports and testimony to the areas of their expertise. We also hold that Grossman's report meets the requirements of Rule 143(f). Issue 3. Deductions and *399 Tax Credits With Respect to EI and Clearwater
The underlying transaction in these cases is substantially identical in all respects to the transaction in Provizer v. Commissioner, T.C. Memo. 1992-177. The parties have stipulated the facts concerning the deficiencies essentially as set forth in our Provizer opinion. Based on these records, we hold that the Clearwater transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Accordingly, we sustain respondent's disallowance of the deductions and credits claimed with respect to Clearwater. Moreover, we note that petitioners in both of the cases at hand have stated their concession of this issue on brief. The record plainly supports respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the applicable law, see Provizer v. Commissioner, supra.
Issue 4. Sec. 6653(a) Negligence
In her first amendment to answer in docket No. 21436-85, respondent asserted that the Paulsons were liable for the negligence additions to tax under *400 section 6653(a) for 1978 and under section 6653(a)(1) and (2) for 1981. In her first amendment to answer in docket No. 21438-85, respondent asserted that Von Almen was liable for the negligence additions to tax under section 6653(a) for 1978 and 1979, and under section 6653(a)(1) and (2) for 1981. Because these additions to tax were raised for the first time in respondent's amendments to answer, respondent bears the burden of proof on these issues. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994). Section 6653(a) for 1978 and 1979, and section 6653(a)(1) for taxable year 1981 provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for taxable year 1981 provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *401 The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Petitioners contend that they were reasonable in claiming deductions and credits with respect to EI's investment in Clearwater. To support their contention, petitioners allege the following: (1) That claiming the deductions and credits with respect to EI's investment in Clearwater was reasonable in light of a so-called oil crisis in the United States in 1981; (2) that in claiming the deductions and credits, they relied upon qualified advisers; and (3) that they should be relieved of the negligence additions to tax for reasons set forth in Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. Petitioners argue, in general terms, that they were reasonable in claiming the deductions and credits related to EI's investment in Clearwater because of an alleged oil crisis in the United States during 1981. On brief Paulson argues *402 very generally that he should be relieved of the negligence additions to tax because he "was reasonably influenced by the then ongoing national energy crisis." At trial, however, Paulson testified that he did not know whether recycling had good economic potential. He did not review the revised offering memorandum and was unaware of the details of the Clearwater transaction and how Clearwater was supposed to generate income. Von Almen testified that he believed that recycling had good economic potential because of the so-called oil crisis in the United States during 1981. Von Almen explained, however, that although he "looked through * * * [the revised offering memorandum] briefly", he did not understand the recycling investment. We find petitioners' vague, general claims concerning the so-called oil crisis to be without merit. Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinctly different from the facts of these cases. In the Krause case, the taxpayers invested in limited *403 partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion notes that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence-related additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Id. at 177. In the present cases, however, one of respondent's experts, Grossman, noted that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastic products." While EOR was, according to our Krause opinion, in the forefront of national policy and *404 the media during the late 1970's and early 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene. Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present cases, petitioners were not experienced or educated in plastics recycling or plastics materials. They did not independently investigate the Sentinel recyclers, and they did not hire an expert in plastics to evaluate the Clearwater transaction. We consider petitioners' arguments with respect to the Krause case inapplicable and find their arguments as to the so-called oil crisis without merit. On their 1981 Federal income tax returns alone, petitioners *405 claimed investment tax and business energy credits with respect to EI's investment in Clearwater that exceeded their investment in Clearwater. The table below shows the amounts of credits related to Clearwater claimed on petitioners' 1981 Federal income tax returns and the amounts of petitioners' investments in Clearwater through EI. Investment Tax and
Investment
Petitioners
Business Energy Credits
in Clearwater [1]
Paulson
$ 9,644
$ 5,586
Von Almen
19,302
11,179
Like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners [Paulson and Von Almen] never had any money in the [Clearwater] deal." In light of the large tax benefits claimed on petitioners' 1981 Federal income tax returns, we conclude that further investigation of the investment clearly was required. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good *406 to be true. McCrary v. Commissioner, 92 T.C. 827, 850 (1989). In fact, petitioners argue that they consulted qualified advisers and relied upon them in claiming the disallowed losses and tax credits. Both Paulson and Von Almen argue that their reliance on the advice of Efron and Cassaday insulates them from the negligence additions to tax. In addition, Von Almen contends that he is not liable for the negligence additions to tax because of his reliance on Paulson, his offeree representative with respect to his investment in EI. Under some circumstances a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Such circumstances are not present in these cases. Moreover, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse *407 a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447. The record does not show that Efron, Cassaday, or Wayne Paulson possessed any special qualifications or professional skills in the recycling or plastics industries. In addition, Efron did not hire anyone with plastics or recycling expertise to evaluate the Clearwater transaction, and the record *408 does not show that Cassaday or Wayne Paulson hired anyone to evaluate the Clearwater transaction. In evaluating the Clearwater transaction, Efron contends that he relied upon (1) the offering materials; (2) Barry Swartz, an accountant; (3) various bankers who loaned funds to EI; and (4) Gordon for his expertise in taxation, finance, and investments. Although Efron testified that when making investments he knows "enough to go get an expert or somebody that knows something", Efron did not consult any plastics engineering or technical experts with respect to EI's investment in Clearwater. Efron relied heavily upon Gordon in deciding to include Clearwater as a part of the revised EI offering. Efron was aware that Gordon was an offeree representative, and received commissions as such, from other recycling investments. Gordon testified that he did not directly receive a sales commission with respect to the EI investment in Clearwater. The record with respect to the payment of commissions on this investment is inconclusive. See supra note 6. In evaluating the Clearwater transaction, Gordon relied on the offering materials and on discussions with persons involved in the transaction. Efron *409 does not suggest that Swartz or the bankers had any peculiar or specialized knowledge of the Clearwater transaction beyond that of any accountant or banker who had read the prospectus. Paulson and Von Almen first became aware of the EI investments through Efron. They contend that they relied heavily on Efron in making their investments in EI and in claiming the associated tax deductions and credits and that they should be relieved of the negligence additions to tax under section 6653(a) because of their alleged reliance on Efron. In 1981, Paulson was acquainted with Efron. He was aware of Efron's success in personal investments and in investments with Paulson's brother, Wayne Paulson. Paulson did not review any of the materials related to his investment in EI. He did not read the original offering memorandum or the revised offering memorandum. Paulson's testimony was general and vague, providing no details of his inquiry of Efron or the advice he received from Efron, if any, following the change in EI's use of funds to include the investment in Clearwater. The only evidence in the record in docket No. 21436-85 concerning Efron's advice to Paulson is Efron's testimony that he advised *410 every limited partner in EI to talk to an independent adviser. Von Almen also was acquainted with Efron. In addition, Efron was Von Almen's attorney with respect to Von Almen's divorce proceedings. Von Almen testified that in 1981 he was looking for tax credits because his Federal income tax status was single and that part of his reason for investing in EI was the tax credit factor. He testified that he "briefly reviewed" both the original and revised offering memoranda. Von Almen testified that Efron explained the original offering memorandum to him but that he did not have any discussions with Efron concerning recycling. The offering memorandum and the revised offering memorandum disclosed the fact that Efron was receiving substantial compensation and fees as the general partner of EI and as a 50-percent owner of MFA. In addition, both of the EI offering memoranda specifically warned potential investors that they were "not to consider the contents of [the offering memoranda] or any communication from the partnership or its general partners as legal or tax advice", and Efron testified that he advised every limited partner in EI to talk to an independent adviser. In our view the *411 purported reliance of Paulson and Von Almen on Efron was not reasonable, in good faith, and based on full disclosure. Accordingly, we hold that petitioners are not entitled to relief from the negligence additions to tax under section 6653(a) because of their alleged reliance on Efron. Paulson and Von Almen also contend that they relied on Cassaday in investing in EI and in claiming the disallowed deductions and credits. [7] During 1981 Cassaday was an officer at the First Bank of Whiting. To finance acquisition of their interests in EI, Efron directed Paulson and Von Almen to Cassaday. Cassaday arranged for the First Bank of Whiting to lend Paulson and Von Almen the entire amount of their investments in EI. The loans were secured solely by the EI investments of Paulson and Von Almen. After the introduction of Clearwater into EI's investments, Cassaday did not change the loan arrangements with Paulson or Von Almen. Von Almen testified that he did not speak to Cassaday after the change in EI's investments and that he did not know if Cassaday was aware of the change in EI's investments. The record in docket No. 21436-85 contains no evidence that petitioner spoke with Cassaday after the *412 change in EI's investments. The testimony of Paulson and Von Almen was general and vague, providing no details of their inquiry of Cassaday. Petitioners do not seriously contend that Cassaday possessed the requisite expertise in recycling or the plastics industry to enable him properly to evaluate the merits of the Clearwater transaction. Moreover, petitioners offered no evidence that they even consulted Cassaday after the change in EI's investments. Paulson and Von Almen's purported reliance on Cassaday was not reasonable. Von Almen contends that he also relied on Wayne Paulson in investing in EI and claiming the disallowed tax deductions and credits. Although Wayne Paulson acted as Von Almen's offeree representative with respect to Von Almen's investment in EI, Wayne Paulson did not review *413 the EI offering memoranda with Von Almen, did not aid Von Almen in completing the offeree questionnaire, and did not discuss recycling with Von Almen. With respect to Wayne Paulson's involvement in his investment in EI, Von Almen stated only that Wayne Paulson, along with Efron, introduced him to EI and that Wayne Paulson acted as his offeree representative concerning the investment in EI. Von Almen provided no evidence that he ever spoke to Wayne Paulson about his investment in EI. Von Almen's purported reliance on Wayne Paulson was not reasonable. In our view, the purported reliance of Paulson and Von Almen on Efron and Cassaday and Von Almen's purported reliance on Wayne Paulson was not reasonable, in good faith, and based on full disclosure. Accordingly, we hold that petitioners are not entitled to relief from the negligence additions to tax under section 6653(a) because of their alleged reliance on professional advice. Petitioners' reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), is misplaced. The facts in the Heasley case are distinctly different from the facts of these cases. The taxpayers in the Heasley case actively *414 monitored their investment and, as the Court of Appeals for the Fifth Circuit stated, intended to profit from the investment. We cannot reach similar conclusions in the instant cases. Paulson and Von Almen failed to provide evidence of any effort to monitor their investments in EI or reliable evidence of any profit objective independent of tax savings. Both Paulson and Von Almen testified that they did not learn of the change in the nature of EI's investments to include recycling until March of 1982. Upon learning of the change in EI's investments to include recycling neither Paulson nor Von Almen asked anyone about the details of the recycling investment even though they did not understand the Clearwater investment. In the Heasley case the taxpayers read portions of the offering materials, while in docket No. 21436-85 Paulson did not read or review either the original offering memorandum or the revised offering memorandum. We consider petitioners' arguments with respect to the Heasley case inapplicable. Paulson and Von Almen entered into the EI investment without any knowledge or background with respect to plastics or recycling and without seeking the advice of anyone who *415 had such knowledge. They did not examine any Sentinel EPE recyclers after learning of the change in EI's investments, and they did not seek the advice of an independent third party concerning the machines' values. Through their investments in EI, Paulson and Von Almen paid Clearwater $ 5,586 and $ 11,179, respectively, and claimed operating losses in the respective amounts of $ 4,470 and $ 8,945 and tax credits in the respective amounts of $ 9,644 and $ 19,302 with respect to those investments for the first year of the investments alone. Under the circumstances of these cases, Paulson and Von Almen should have known better than to claim the large deductions and tax credits with respect to Clearwater on their 1981 Federal income tax returns. We conclude that petitioners were negligent in claiming the deductions and credits with respect to EI's investment in Clearwater on their 1981 Federal income tax returns. We hold, upon consideration of the entire records, that the Paulsons are liable for the negligence additions to tax under the provisions of section 6653(a) for 1978 and section 6653(a)(1) and (2) for 1981, and Von Almen is liable for the negligence additions to tax under the *416 provisions of section 6653(a) for 1978 and 1979 and section 6653(a)(1) and (2) for 1981. Issue 5. Sec. 6659 Valuation Overstatement
In her first amendment to answer in docket No. 21436-85, respondent asserted that the Paulsons were liable for the additions to tax for valuation overstatement under section 6659 on the underpayments of their 1978 and 1981 Federal income taxes attributable to the investment tax and business energy credits claimed with respect to EI and Clearwater. Likewise, in her first amendment to answer in docket No. 21438-85, respondent asserted that Von Almen was liable for the additions to tax under section 6659 on the underpayments of his 1978, 1979, and 1981 Federal income taxes attributable to the investment tax and business energy credits claimed with respect to EI and Clearwater. Because these additions to tax were raised for the first time in respondent's amendments to answer, respondent bears the burden of proving that petitioners are liable for the section 6659 additions to tax. Rule 142(a); Vecchio v. Commissioner, 103 T.C. at 196. The underlying facts of these cases with respect to this issue are substantially the *417 same as those in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, petitioners' arguments with respect to this issue are essentially identical to the arguments made in the Fine case. For reasons set forth in the Fine opinion, we hold that petitioners are liable for the section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the disallowed credits claimed with respect to EI and Clearwater. [8]
Issue 6. Sec. 6621(c) Tax-Motivated Transactions
In notices *418 of deficiency, respondent determined that interest on deficiencies accruing after December 31, 1984, would be calculated under section 6621(c). The annual rate of interest under section 6621(c) equals 120 percent of the interest payable under section 6601 with respect to any substantial underpayment attributable to tax-motivated transactions. An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The underlying facts of these cases are substantially the same as those in Fine v. Commissioner, supra. In addition, petitioners' arguments on brief with respect to this issue are verbatim copies of the arguments in the taxpayers' briefs in the Fine case. For reasons set forth in the Fine opinion, we hold that respondent's determinations as to the applicable interest rate for deficiencies attributable to tax-motivated transactions are sustained and the increased rate of interest applies for the taxable years in issue. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise stated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner Gerald J. Von Almen and Dixie Von Almen filed joint Federal income tax returns for 1978 and 1979. In 1982, Gerald J. Von Almen filed amended returns, in his name only, for 1978 and 1979 in order to carry back investment tax and business energy credits claimed on his individual 1981 Federal income tax return. The notice of deficiency issued for taxable years 1978 and 1979 in docket No. 21438-85 was issued only to Gerald J. Von Almen because the deficiencies determined for those years solely relate to the carrybacks.↩
3. The notices of deficiency refer to sec. 6621(d). This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744 and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989 (sec. 7721(d) of the Act). The repeal does not affect the instant cases. For simplicity, we shall refer to this section as sec. 6621(c)↩.
1. 50% of the interest payable with respect to the portion of the underpayment attributable to negligence. ↩
4. The parties did not stipulate certain facts concerning the Provizers, facts regarding the expert opinions, and other matters that we consider of minimal significance. Although the parties did not stipulate our findings regarding the expert opinions, they stipulated our ultimate finding of fact concerning the fair market value of the recyclers during 1981.↩
5. Von Almen claimed a regular investment tax credit with respect to EI and Clearwater in the amount of $ 9,651 on his initial 1981 Federal income tax return and claimed a business energy credit with respect to EI and Clearwater in the amount of $ 9,651 on an amended 1981 Federal income tax return.↩
6. The Clearwater offering memorandum states that the partnership will pay sales commissions and fees to offering representatives in an amount equal to 10 percent of the price paid by the investor represented by such person. The offering memorandum further states that if such fees are not paid "they will either be retained by the general partner as additional compensation if permitted by applicable state law, or applied in reduction of the subscription price." EI's Schedule K-1 for 1981 shows that EI paid full price, $ 350,000 for its seven units of Clearwater, so the 10-percent commission was not applied to reduce the subscription price. Gordon specifically stated that in the case of EI he did not directly receive the sales commission. Efron expressed doubt that he individually had been an offeree representative in connection with Clearwater or any other transaction. There are suggestions that the commission might have been paid to MFA or offeree representatives of individual investors, but the record on this subject is inconclusive.↩
1. Calculated as follows: EI's Investment in Clearwater $ 350,000 x Paulson's Share of EI 1.596% = $ 5,586EI's Investment in Clearwater $ 350,000 x Von Almen's Share of EI 3.194%= $ 11,179↩
7. Although Von Almen testified that in investing in EI and claiming the associated tax deductions and credits he relied upon Efron 90 percent and Wayne Paulson 10 percent, on brief he asserts that he also relied upon Cassaday.↩
8. Sec. 6659 applies to returns filed after Dec. 31, 1981. Although the Paulsons filed their 1978 return prior to Dec. 31, 1981, and Von Almen filed his 1978 and 1979 returns prior to Dec. 31, 1981, they are liable for the additions to tax under sec. 6659 for those years because the underpayments of tax for those years are attributable to the carryback of unused tax credits claimed on their 1981 returns. See Nielsen v. Commissioner, 87 T.C. 779↩ (1986).